IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

OLIVER TAPIA,

      Plaintiff,

vs.                                                                              Civ. No. 03-0378 MV/WDS

CITY OF ALBUQUERQUE,

      Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant City of Albuquerque's Motion for Summary Judgment, filed June 25, 2004 **[Doc. No. 49]**. The Court, having considered the motion, briefs, relevant law, and being otherwise fully informed, finds that the motion is well-taken and will be **GRANTED**.

## FACTUAL BACKGROUND

Oliver Tapia ("Plaintiff") has been an employee of the City of Albuquerque ("Defendant") since 1987. His first job with the City was as a custodian for the Barelas Community Center. After that, Plaintiff worked in the Street Maintenance Department, the Solid Waste Department, and finally in the Public Works Department, where he currently works. At Public Works, Plaintiff began as a water meter reader. After a knee injury, Plaintiff became a Field Collection Representative, which primarily required him to turn customers' water on and off. There was only one other Field Collection Representative in the department, Brian Harvey, who was hired at the same time as Plaintiff. Sheron Matson was the Manager of Customer Services for part of Plaintiff's tenure as a Field Collection Representative. Plaintiff's first direct supervisor as a Field

Collection Representative was Tina Archuleta. Ms. Archuleta later was replaced by Barbara Romero.

Sometime during August 2001, Plaintiff filed an informal grievance with AFSCME Local 624 alleging on-the-job harassment and discrimination. On August 17, 2001, Robert Sanchez, vice president of Local 624, met with Ms. Matson about these issues, including "the unfair treatment of Mr. Tapia, Mr. Tapia being required to adhere to certain policies and job requirements which are not applied to other employees in similar job descriptions." Mr. Sanchez sent a letter to Ms. Matson on August 28, 2001, requesting that "the new required changes in working conditions solely for Mr. Tapia be applied equally with all representatives or be removed from Mr. Tapias' (sic) job assignments." Finally, Mr. Sanchez stated that if Plaintiff continued to be monitored and required to perform additional duties, the Union would file a formal grievance. No formal grievance was ever filed with the City.

On September 14, 2001, Plaintiff took time off under the Family and Medical Leave Act ("FMLA") due to work-related depression and stress. While the leave was expected to last through October 4, 2001, it continued though November 14, 2001. Sometime during November before returning to work, Plaintiff requested a job transfer because of conflicts with Ms. Archuleta and Ms. Matson. On November 6, 2001, Plaintiff, along with two Union representatives, met with LaVerne Armijo, a City of Albuquerque Labor Relations Officer, about Plaintiff's transfer request. In a letter to the Human Resources Department dated November 26, 2001, Ms. Armijo states that she told Plaintiff that she had been unable to find a transfer for him because of the hiring freeze, the change in administration, and "the fact that his transfer request was not high priority since there was no obligation on the city's part to transfer him." Pltf. Exh. 7. When Ms.

Armijo told Plaintiff that it would be at least another month before she could determine the feasibility of a transfer, Plaintiff stated, "If you put me back there, I'm afraid I'll knock her head off."[1]  *Id.*  Ms. Armijo warned Plaintiff that it was very serious to make threats of that nature.

After the meeting, Ms. Armijo contacted Dr. Julia Bain of Employee Health Services and Joyce Rodarte of Human Resources, who recommended that Plaintiff be placed on administrative leave with pay pending a fitness for duty evaluation.  Larry A. Blair, Director of the Public Works Department, informed Plaintiff of this decision in a letter dated November 13, 2001.  Plaintiff never underwent a fitness for duty evaluation because City of Albuquerque officials ultimately determined that it was unnecessary.

On November 19, 2001, Plaintiff filed a "Charge of Discrimination" with the New Mexico Human Rights Division and the Equal Employment Opportunity Commission ("EEOC").  The charge alleged that Plaintiff had been harassed, discriminated against because of national origin, and retaliated against for complaining about discrimination.  Plaintiff specifically stated in his Charge that Ms. Matson "harasses me whereas she favors a Black co-worker in job assignments, filling out trip sheets and in other ways."  The City of Albuquerque received notice of Plaintiff's EEOC Charge on or about December 4, 2001.  *See* Def. Exh. L.  The Public Works Department did not receive notice of Plaintiff's EEOC Charge until Judy Kelley, the Equal Employment Opportunity Officer, sent an inter-office memorandum to Bob Gurule, the Acting Director of the

---

[1] In his deposition, Plaintiff disputes making this statement.  While he states that he can offer proof that he did not make the statement, nowhere in his response does he present such evidence.  In fact, in his response to Defendant's motion, Plaintiff argues that the statement was not intended as a threat, impliedly admitting that he made the statement.  While Plaintiff may not have meant the statement as a threat, absent evidence to the contrary, the Court concludes that Plaintiff did make the statement.

Public Works Department on December 6, 2001.  *See* Def. Exhs. L & L-2.  On December 4, 2001, Ms. Matson issued Plaintiff a letter of instruction, as directed by the department director, informing him that he was not to make verbal threats against his supervisors or co-workers. Plaintiff refused to sign the letter of instruction.

In a letter dated July 23, 2002, Plaintiff again requested a transfer based on problems with Ms. Matson.  *See* Pltf. Exh. 9.  Plaintiff stated that he was willing to accept any position for which he qualified, even if it resulted in a pay cut.  On August 12, 2002, Plaintiff was transferred to Pino Yards in the Public Works Department.  In 2003, Plaintiff applied for a position as a utility technician.  While a committee recommended Plaintiff's selection, the Department Director, who makes the final selections, ultimately chose other individuals because he did not feel that Plaintiff was best qualified for the position.  This decision was made in late 2003.  *See* Def. Exh. K.

On March 25, 2003, Plaintiff filed a Complaint against the City of Albuquerque, alleging violations of Title VII, 42 U.S.C. § 2000e, *et seq*.  Plaintiff filed one claim for national origin discrimination and one claim for retaliation.   Defendant now seeks summary judgment on Plaintiff's Title VII claims against it.

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). There is no requirement that the moving party negate the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citations omitted). Rather than "merely show there is some metaphysical doubt as to the material facts," the nonmoving party is required to "go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson*, 477 U.S. at 248. Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus*, 985 F. Supp at 1281.

## **DISCUSSION**

In his Complaint, Plaintiff argues that Defendant discriminated against him on the basis of his national origin in violation of 42 U.S.C. § 2000e-2. In his response to Defendant's motion for summary judgment, however, Plaintiff addresses only his retaliation claim under 42 U.S.C. §

2000e-3(a). The Court interprets this omission as Plaintiff conceding summary judgment on his discrimination claim under 42 U.S.C. § 2000e-2. The Court will grant Defendant's motion for summary judgment on Plaintiff's discrimination claim.

## I.     Plaintiff's Retaliation Claim

According to Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Where there is no direct evidence of retaliation, as in the instant case, the burden-shifting analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), guides this Court's analysis. *See also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (applying the *McDonnell Douglas* burden-shifting structure to a retaliation claim). Under *McDonnell Douglas*, Plaintiff first must establish a prima facie case of retaliation. *Id.* Once the Plaintiff establishes a prima facie case, the burden shifts to Defendant to present a non-discriminatory reason for the employment decision in question. *Jones v. Barhart*, 349 F.3d 1260, 1266 (10th Cir. 2003). If the employer presents a non-discriminatory reason for its decision, the burden shifts back to Plaintiff to show that "there is a genuine issue of material fact as to whether the employer's proffered reason for the challenged action is pretextual--i.e., unworthy of belief." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citations and quotations omitted); *see also Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1120 (10th Cir. 2001) (an employee may demonstrate pretext by showing the employer's proffered reason

6

was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief).

To satisfy the first prong under *McDonnell Douglas*, Plaintiff must establish a prima facie case of retaliation. To state a prima facie case, Plaintiff must demonstrate that: (1) he engaged in protected activity; (2) he suffered an adverse employment action subsequent to or contemporaneous with his protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000). There is no dispute that by filing an informal union grievance in August 2001 and an EEOC Charge in November 2001, Plaintiff engaged in protected activities. *See McCue v. State of Kansas*, 165 F.3d 784, 789 (10th Cir. 1999). The Court now turns to the other elements of Plaintiff's prima facie case.

### A.     Has Plaintiff Established a Prima Facie Case of Retaliation?

Plaintiff contends that after filing an informal grievance with his union and after filing an EEOC Charge, he suffered several adverse employment actions: (1) being required to do additional duties in the performance of his job not required of other employees, such as filling out trip sheets; (2) being monitored by his supervisors in a harassing and retaliatory fashion; (3) being given a "false and misleading" letter of instruction; (4) being subjected to a continuing a pattern of harassment following Plaintiff's return to work from FMLA leave after he had filed his EEOC Charge; and (5) being denied a transfer to the utility technician position that Plaintiff had "clearly been selected for."[2] Pltf. Resp. at 8. Plaintiff argues there is a causal connection between at least some of the adverse employment actions he alleges and his protected activities. Defendant, on the

---

[2] In his response, Plaintiff states that the adverse employment actions he suffered are "not limited to" the actions listed therein. Since Plaintiff does not identify specifically any other adverse actions, however, the Court is unable to consider them in its Opinion.

7

other hand, argues that Plaintiff cannot establish a prima facie case of retaliation because he never suffered an adverse employment action, or if he did, such an action was not causally connected to his protected activity.

      1.    *Adverse Employment Actions*

The Tenth Circuit determines whether an employment action is adverse on a case-by-case basis. *See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998). While the Tenth Circuit will liberally construe what constitutes an adverse employment action, *see id.*, the action must amount to "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998). For example, mere inconveniences or alterations of job responsibilities do not constitute adverse employment actions. *See Annett v. University of Kansas*, 371 F.3d 1233, 1237-38 (10th Cir. 2004). Tense on-the-job relationships also will not constitute an adverse employment action. *See, e.g., Jeffries v. State of Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998). On the other hand, acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may constitute adverse employment actions. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996).

In the instant case, the Court finds that not all of the employment actions alleged by Plaintiff are actually "adverse" given the record. First, requiring Plaintiff to complete minor additional job duties that do not substantially alter his job status and are required of other

employees, such as filling out trip sheets,[3] does not constitute an adverse employment action. *See Annett*, 371 F.3d at 1237-38. Second, "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim." *See Gunnell*, 152 F.3d at 1264. The *Gunnell* court noted, however, that incidents of rudeness likely will not support a claim for retaliation because Title VII is neither a "'general civility code' nor does it make actionable the 'ordinary tribulations of the workplace.'" *Id.* at 1265 (citations omitted). Thus, Plaintiff's claim that he was harassed and excessively monitored by his co-workers and supervisors may constitute an adverse employment action if the harassment was sufficiently severe. As to this issue, the Court finds there is a genuine issue of material fact. Plaintiff states in his deposition that either Ms. Romero, Ms. Watson, or Ms. Archuleta stood in the corner of the door, waiting for him to come to work. They would follow him as soon as he would walk in to work. *See* Def. Exh. A at 63:8-9, 64:8-11, 70:12-13. Plaintiff contends that this continued every day for the entire period of Ms. Matson's tenure as his manager.

> Q. [by Ms. Forney]: All three of them followed you every day?
>
> A. [by Plaintiff]: Almost every day.
>
> Q. [by Ms. Forney]: Every day all three of them?
>
> A. [by Plaintiff]: All three of them. If it wasn't them – if it wasn't Sheran, it was Sheran and Barbara. If it wasn't Barbara, it was Sheran and Tina. It was one of them all the time.
>
> Q. [by Ms. Forney]: Every day?

---

[3] Mr. Harvey stated that he also was required to fill out trip sheets. *See* Def. Exh. C at 48:2-17.

> A. [by Plaintiff]: Most every day.
>
> Q. [by Ms. Forney]: For four years?
>
> A. [by Plaintiff]: Well, all the time that she [Ms. Matson] was there.

*See id*. at 68:12-25. Plaintiff further contends that Ms. Matson continually and unjustifiably monitored his work. *See* Pltf. Exh. 1 at 10:13-11:22; Pltf. Exh. 4 at 7:11-8:18; Def. Exh. A at 11-90:24, 98:2-7, 106:24-107:23. Plaintiff states that this behavior humiliated him. *See* Def. Exh. A at 220:11-12. Additionally, it caused him on-the-job stress and exacerbated depression problems. *See* Pltf. Exh. 5. Ms. Matson, Ms. Romero, and Ms. Archuleta, however, deny ever following Plaintiff or sending out other employees to watch him. *See* Def. Exh. B at 168:23-169:12; Def. Exh. D at 15:19-16:2; Def. Exh. F at 28:24-28:1.

As to Plaintiff's third alleged adverse employment action – the "letter of instruction" issued by Ms. Matson[4] – the Court concludes that Plaintiff has failed to put forth sufficient evidence to establish that it was an adverse employment action. While the Tenth Circuit has recognized that an adverse employment action can arise from events having an adverse impact on future employment opportunities, *see Berry*, 74 F.3d at 986, the Circuit has limited the scope of this principle to those cases in which the plaintiff demonstrates a clear, concrete or significant risk to future employment opportunities. *See id.* at 986-87 (wrongfully reporting plaintiff of a suspected crime constituted an adverse employment action because being a defendant in a criminal trial "carries a significant risk of humiliation, damage to reputation, and a concomitant harm to

---

[4] While Plaintiff does not make clear whether he is referring to the letter of instruction following Plaintiff turning on a customer's water in exchange for Sacramento Kings tickets or the letter of instruction following Plaintiff making a perceived threat in front of Ms. Armijo, it appears he is referring to the latter.

10

future employment prospects").

In the instant case, Plaintiff has not shown there was a real or significant risk of harm to his future employment because of either letter of instruction. Plaintiff himself states that a letter of instruction is not a reprimand, rather it is "just an instruction." Def. Exh. A, 163:22-23. *See Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (negative performance evaluations, standing alone, cannot constitute an adverse employment action); *see also Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (holding that a negative performance evaluation was not an adverse employment action where the employer did not take any other action against employee). The evidence does not suggest that Plaintiff's supervisors "'papered [plaintiff's] file with negative reports[.]'" *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (negative evaluations papering employee's personnel file negatively affected his job opportunities).

In addition, as a practical matter, the letters of instruction do not appear to have affected Plaintiff's job status as he was not terminated or demoted,[5] nor does the record show that it made it more likely that he would be terminated, despite the fact that at least one of the letter of instructions stated that "[f]ailure to follow this directive could result in disciplinary action in the future."[6] Def. Exh. 5. Ms. Matson herself stated that letters of instruction are not disciplinary actions. Def. Exh. B at 115:9-11. Thus, Plaintiff's letters of instruction are unlike the written reprimands in *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998), which the Tenth Circuit determined to be adverse employment actions because the record demonstrated that

---

[5] Plaintiff concedes that the letter of instruction did not affect his pay or benefits or otherwise cause him economic harm.

[6] Plaintiff was placed on administrative leave with pay after he made the perceived threat, however this was before Ms. Matson issued the letter of instruction on December 4, 2001.

the more warnings an employee received, the more likely it was she could be terminated for a further infraction. Furthermore, any speculative future harm to Plaintiff's job status as a result of the letters of instruction cannot constitute an adverse employment action. *See Aquilino v. University of Kansas*, 268 F.3d 930, 936 (10th Cir. 2001).

Finally, even if the Court is wrong and the letters of instruction did rise to the level of adverse actions, they were issued because of legitimate, nondiscriminatory reasons. Supervisors issued Plaintiff's first letter of instruction because Plaintiff accepted basketball tickets in exchange for turning on a customer's water after hours, in contravention of Ms. Archuleta's direct orders and City policy. Plaintiff conceded that he knew that taking the tickets violated City policy but that he did it anyway. *See* Def. Exh. A at 155:3-4; 157:9-10. Ms. Matson issued Plaintiff's second letter of instruction after Plaintiff made a perceived threat to his supervisors in contravention of the City of Albuquerque's Code of Conduct.[7] Plaintiff is unable to demonstrate that a reasonable juror would find either of these justifications unworthy of belief as pretexts for discrimination.

The Court does not find that Plaintiff's fourth alleged action – a continuing pattern of harassment following Plaintiff's return from work from FMLA leave and after he filed his EEOC Charge – constitutes an adverse employment action because Plaintiff offers no evidence, other

---

[7] Plaintiff argues that the information in the letter of instruction was "false and misleading" because he did not make a threat. Rather, he "merely expressed a fear he had at the time he was in a depressive state." Pltf. Resp. at 10. Plaintiff's intent in the making the statement, however, is not relevant, because his audience legitimately perceived it as a threat. It is similarly irrelevant that Plaintiff had not threatened another employee in Ms. Matson's presence in the past. Pltf. Exh. 2 at 198:22-199:3.

than his own conclusory allegations in his response to Defendant's motion,[8] that he was in any way subjected to increased harassment upon his return from FMLA leave. Furthermore, Plaintiff does not allege with any specificity what this harassment entailed, beyond his other allegations of harassment addressed above. Unsubstantiated allegations carry no probative weight in summary judgment proceedings. *Phillips v. Calhoun*, 956 F.2d 949, 951 n. 3 (10th Cir. 1992).

      Finally, the Court finds that Defendant's decision not to select Plaintiff for the utility technician position for which he had applied was not an adverse employment action. The utility technician position was at most a lateral transfer and probably a demotion because it paid less. *See* Def. Exh. E. The position could result in higher salary several years down the road, but only after Plaintiff completed a certification courses and training program levels. *See id*. This kind of speculative gain will not support the finding of an adverse employment action. *See Aquilino*, 268 F.3d at 936 (rejecting plaintiff's claim that denial of an appointment as a research associate constituted an adverse action when the alleged harm to her future employment prospects was speculative and rested solely in her untested belief in an alternative career path as an academic).

      Furthermore, even if Defendant's decision not to hire Plaintiff for the utility technician position does constitute an adverse employment action, the Court finds that it ultimately cannot support a retaliation claim for other reasons. First, Plaintiff has not shown a causal or temporal connection between the decision, made in 2003, and his protected activities, in 2001. Furthermore, he has not demonstrated any other concrete reason to infer a retaliatory motive in

---

[8] Plaintiff states: "[T]he ongoing harassment Tapia complained of prior to going out of FMLA leave increased in intensity immediately following his return to work--including monitoring, disciplinary action, and unwarranted additional duties piled on Tapia in performance of his job." Pltf. Resp. at 11. There is no evidence in the record to support this allegation.

spite of the two-year time gap. Second, Defendant has offered a legitimate non-discriminatory reason for not selecting Plaintiff – the City determined that Plaintiff was not the best qualified person for the position, even though a committee had recommended his selection. Selecting the best candidate for the job is a valid, nondiscriminatory justification for not transferring Plaintiff. *See Simms v. Oklahoma*, 165 F.3d 1321, 1328 (10th Cir. 1999). Plaintiff has not demonstrated in any way that he was more qualified than the people who were selected ultimately. Finally, Plaintiff has not shown that Defendant's justification that Plaintiff was not the most qualified candidate is so plagued by "weaknesses, implausibilities, incoherencies, or contradictions" as to be unworthy of credence. *See Morgan*, 108 F.3d at 1323.

    2.  *Causal Connection*

  As to the third prong of the prima facie case, Plaintiff must demonstrate a causal connection between the protected activity and the adverse employment action. Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir. 1982), *cert. denied,* 459 U.S. 1071 (1982). "Close proximity in time may provide some probative evidence of retaliatory intent." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1299 (10th Cir. 1998). An inference of retaliation based on timing "can only be made, however, where 'close temporal proximity' exists between the bringing of charges and the subsequent adverse action." *Candelaria v. EG & G Energy Measurements, Inc.*, 33 F.3d 1259, 1262 (10th Cir. 1994) (quoting *Smith v. Maschner*, 899 F.2d 940, 948-49 (10th Cir. 1990)); *see also Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four months insufficient to establish causal connection between protected activity and

14

adverse actions); *Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (10th Cir. 1997) (three months insufficient).  Where close temporal proximity is lacking, a plaintiff may rely on "additional evidence beyond mere temporal proximity to establish causation."  *Conner*, 121 F.3d at 1395.  Such additional indirect evidence can include heightened scrutiny, negative criticism, differential treatment or violation of standard internal protocol and procedures.  *Marx v. Schnuck Markets, Inc.,* 76 F.3d 324, 329 (10th Cir. 1996) (noting deficiencies in job performance can be evidence of pattern of retaliation).

     The Court has found that the only "adverse employment action" suffered by Plaintiff for purposes of establishing his prima facie case is the allegedly harassing behavior of his supervisors, including being followed and monitored while on the job.  Having examined Plaintiff's circumstantial evidence on this issue, however, the Court cannot say that it permits an inference of proximal causation or an inference that his supervisors' actions were a desire to retaliate for Plaintiff's protected activities.  In fact, Plaintiff has not demonstrated any causal link between his supervisors' behavior and his protected activities.  Plaintiff contends that his supervisors' harassing behavior happened "every day" while Ms. Matson was his manager.  The record shows that Ms. Matson was his manager in excess of two years.  Plaintiff offers no evidence to demonstrate that his supervisors monitored him or followed him more closely after he filed his union grievance in August 2001 or his EEOC Charge in November 2001.  Thus, Plaintiff cannot show any specific causal link between the alleged harassment and Plaintiff's protected activities.

     For these reasons, the Court finds that, as a matter of law, Plaintiff has failed to establish a prima facie case of retaliation.  The letter of instruction, the failure to select Plaintiff for the utility technician position, the alleged increased harassment after Plaintiff returned from FMLA leave,

and requiring Plaintiff to fill out trip sheets are not "adverse employment actions" given the record in the instant case. As to the harassing treatment by his supervisors, Plaintiff has failed to establish any causal connection between that behavior and his protected activities. The City of Albuquerque thus is entitled to summary judgment on Plaintiff's retaliation claim.

## **CONCLUSION**

**IT IS THEREFORE ORDERED** Defendants' Motion for Summary Judgment, filed June 25, 2004, **[Doc. No. 49]**, is **GRANTED**.

Dated this 29th day of December, 2004.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
Michael E. Mozes

Attorney for Defendant:
Paula Forney